IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| FREEDOM FOUNDATION, a Washington nonprofit organization, | ) ) ) | No. 76319-9-I (consolidated with No. 76325-3-I) |
| Appellant/Cross Respondent, | ) ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| SEIU HEALTHCARE NORTHWEST, TRAINING PARTNERSHIP, a 501(c)(3), | ) ) ) | |
| Respondent/Cross Appellant. | ) | FILED: August 27, 2018 |

SCHINDLER, J. — The Freedom Foundation requested the Service Employees

International Union Healthcare Northwest Training Partnership (Training Partnership)

produce "public records" under chapter 42.56 RCW, the Public Records Act (PRA). The

trial court ruled on summary judgment that the Training Partnership is not subject to the

PRA and dismissed the lawsuit. Freedom Foundation appeals summary judgment

dismissal of the lawsuit, denial of a CR 56(f) motion to continue the summary judgment

hearing, the order granting in part and denying in part entry of protective orders, and the

order granting the motion to seal.[1] The Training Partnership cross appeals the denial of

---

[1] The Freedom Foundation also designates the order denying the motion to quash a subpoena duces tecum, the order denying the motion to compel, and the order denying the request for sanctions in the notice of appeal. But the Freedom Foundation does not address these orders on appeal. RAP 10.3(6) (party must provide argument in support of issues presented for review).

attorney fees and sanctions under CR 11 and RCW 4.84.185.[2] We affirm.

In-Home Care Service Providers

Congress established the Medicaid program under Title XIX of the Social Security Act, 42 U.S.C. §§ 301-1397mm. The federal Medicaid program funds state programs that provide in-home care services to individuals who would otherwise require admission to a hospital, nursing, or intermediate care facility. 42 U.S.C. § 1396n(c)(1). "States design and administer their Medicaid programs within broad federal guidelines." Caritas Servs., Inc. v. Dep't of Soc. & Health Servs., 123 Wn.2d 391, 396, 869 P.2d 28 (1994) (citing 42 U.S.C. § 1396a(a); 42 C.F.R. § 403.304(b)(1)).

To receive Medicaid funding, federal law requires a state to adopt a program that compensates in-home care service providers and ensures the providers meet a minimum set of qualifications and requirements. 42 U.S.C. § 1396n(c)(1); see also 42 C.F.R. §§ 440.180, 441.300-.310.

In 1989, the Washington State Legislature adopted chapter 74.39 RCW, "Long-Term Care Service Options." LAWS OF 1989, ch. 427. As RCW 74.39.020 states, the Medicaid program, Title XIX of the federal Social Security Act, allows states "to increase federal funds available to provide community-based long-term care services to functionally disabled persons in their homes, and in noninstitutional residential facilities, such as adult family homes and congregate care facilities." An express purpose of chapter 74.39 RCW is to "[e]stablish a balanced range of community-based health, social, and supportive services that deliver long-term care services to chronically, functionally disabled persons of all ages." Former RCW 74.39.005(1) (1989). The

---

[2] We consolidated the cross appeal.

statute established a "long-term care commission" to "develop legislation and recommend administrative actions" necessary to achieve long-term care reforms, including "[p]ublic and private alternative funding for long-term care services, such as federal Title XIX funding of personal care services." Former RCW 74.39.040(2)(g) (1989).

In 1993, Washington enacted chapter 74.39A RCW, "Long-Term Care Services Options—Expansion." LAWS OF 1993, ch. 508. The legislative findings state, in pertinent part:

> The legislature finds that the aging of the population and advanced medical technology have resulted in a growing number of persons who require assistance. . . .
>     The legislature further finds that the public interest would best be served by a broad array of long-term care services that support persons who need such services at home or in the community whenever practicable and that promote individual autonomy, dignity, and choice.

Former RCW 74.39A.005 (1993).

The purpose of chapter 74.39A RCW, Long-Term Care Services Options—Expansion, is to provide "a balanced array of health, social, and supportive services that promote individual choice, dignity, and the highest practicable level of independence," and that "[h]ome and community-based services be developed, expanded, or maintained in order to meet the needs of consumers and to maximize effective use of limited resources." RCW 74.39A.007(1), (2). RCW 74.39A.007 designates the Department of Social and Health Services (DSHS) to administer the long-term care services program.

Engrossed Second Substitute House Bill 2284

In 2007, the legislature passed Engrossed Second Substitute House Bill

3

(ESSHB) 2284, "AN ACT Relating to the training of and collective bargaining over the training of care providers." ENGROSSED SECOND SUBSTITUTE H.B. 2284, at 1, 60th Leg., Reg. Sess. (Wash. 2007).

ESSHB 2284 defined "long-term care workers" as follows:

"Long-term care workers" includes all persons who are long-term care workers for the elderly or persons with disabilities, including but not limited to individual providers of home care services, direct care employees of home care agencies, providers of home care services to persons with developmental disabilities under Title 71 RCW, all direct care workers in state-licensed boarding homes, assisted living facilities, and adult family homes, respite care providers, community residential service providers, and any other direct care worker providing home or community-based services to the elderly or persons with functional disabilities or developmental disabilities.

ENGROSSED SECOND SUBSTITUTE H.B. 2284, at 7 (codified at former RCW 74.39A.009(11)(a) (2007)).[3]

ESSHB 2284 established training requirements for all long-term care workers. Former RCW 74.39A.330, .340, .350 (2007). ESSHB 2284 required all long-term care workers to receive "on-the-job training or peer mentorship for at least one hour per week in the first ninety days of work." Former RCW 74.39A.330. ESSHB 2284 required all long-term care workers to "complete twelve hours of continuing education training in advanced training topics each year." Former RCW 74.39A.340.

ESSHB 2284 designated individual providers as "public employees" solely for purposes of collective bargaining. RCW 74.39A.270(1). ESSHB 2284 designates the governor as the "public employer" of individual providers represented by an exclusive bargaining agent for purposes of collective bargaining. RCW 74.39A.270(1). ESSHB 2284 authorizes the state of Washington (State) to engage in collective bargaining on

---

[3] Emphasis omitted.

behalf of individual providers over state contributors to the training partnership:

> At the request of the exclusive bargaining representative, the governor or the governor's designee appointed under chapter 41.80 RCW shall engage in collective bargaining, as defined in RCW 41.56.030(4), with the exclusive bargaining representative over employer contributions to the training partnership for the costs of: (a) Meeting all training and peer mentoring required under this chapter; and (b) other training intended to promote the career development of individual providers.

Former RCW 74.39A.270(7) (2007).

ESSHB 2284 states all training and peer mentoring under chapter 74.39A RCW for all in-home care providers represented by a union "shall be provided by a training partnership" designated by the bargaining representative with contributions to begin July 1, 2009. Former RCW 74.39A.360 (2007).

> Beginning January 1, 2010, for individual providers represented by an exclusive bargaining representative under RCW 74.39A.270, all training and peer mentoring required under this chapter shall be provided by a training partnership. Contributions to the partnership pursuant to a collective bargaining agreement negotiated under this chapter shall be made beginning July 1, 2009. The training partnership shall provide reports as required by the department verifying that all individual providers have complied with all training requirements. The exclusive bargaining representative shall designate the training partnership.

Former RCW 74.39A.360.

ESSHB 2284 states a "training partnership" is a joint partnership established by or maintained by the office of the governor and the exclusive bargaining representative of individual providers. Former RCW 74.39A.009(14). Former RCW 74.39A.009(14) states:

> "Training partnership" means a joint partnership or trust established and maintained jointly by the office of the governor and the exclusive bargaining representative of individual providers . . . to provide training, peer mentoring, and examinations required under this chapter.

ESSHB 2284 also established a "joint legislative and executive task force" to "evaluate current training requirements for long-term care workers" and make recommendations on "the appropriate number of basic training hours, the content of basic training curricula, and the development of criteria associated with certification of new long-term care workers" by December 1, 2007. ENGROSSED SECOND SUBSTITUTE H.B. 2284, at 1, 4, 5.[4] The "Long-Term Care Worker Training Development Workgroup" met in August and September of 2007. Task force members included a state house representative, DSHS, Catholic Community Services, Eagle Health, Addus Healthcare, and Service Employees International Union (SEIU) 775.

2007-2009 Collective Bargaining Agreement between the State and SEIU 775

In 2007, the State negotiated the first collective bargaining agreement (CBA) with SEIU 775, the exclusive representative for individual providers of in-home care services. The July 1, 2007 to June 30, 2009 CBA states the parties agreed to "establish a Joint Committee on Training and Education" to "develop a proposal for a joint training and education partnership fund for the purpose of conducting training . . . for independent providers covered under this Agreement."

2007 SEIU Healthcare Northwest Partnership

On November 20, 2007, SEIU 775 and three private in-home care service provider employers, Chesterfield Health Services, Korean Women's Association, and Unique Services, formed a multi-employer benefit plan. The "Plan Agreement and Declaration of Trust" (Agreement) created the SEIU Healthcare Northwest Training Partnership (Training Partnership) as a nonprofit 501(c)(3) multi-employer welfare

---

[4] (Emphasis omitted.) The section of ESSHB 2284 that established the task force was not codified.

benefit plan under the Employment Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1453.

"Congress enacted ERISA to provide comprehensive and uniform federal regulation for employee benefits plans." Navlet v. Port of Seattle, 164 Wn.2d 818, 829, 194 P.3d 221 (2008). ERISA governs employee benefit plans. 29 U.S.C. § 1001; Navlet, 164 Wn.2d at 829.[5] An ERISA employee welfare benefit plan is "any plan, fund, or program" established or maintained by an employer organization for the purpose of providing "apprenticeship or other training programs." 29 U.S.C. §§ 1002(1)(A), 1003(a). A multi-employer plan is a plan "to which more than one employer is required to contribute" and is maintained "pursuant to one or more collective bargaining agreements." 29 U.S.C. § 1002(37)(A).

ERISA vests the " 'exclusive authority and discretion to manage and control the assets of the plan' in the trustees alone, and not the employer or the union," and the trustee must act "solely in the interest of the participants and beneficiaries." Nat'l Labor Relations Bd. v. Amax Coal Co., 453 U.S. 322, 333, 101 S. Ct. 2789, 69 L. Ed. 2d 672, 69 L. Ed. 2d 672 (1981) (quoting 29 U.S.C. § 1103(a); citing 29 U.S.C. § 1104(a)(1)). "[T]he fiduciary requirements of ERISA specifically insulate the trust from the employer's interest." Amax, 453 U.S. at 333.

The "sole purpose" of the Training Partnership is to provide training and educational benefits to in-home "long-term care workers" and individual health care service providers. The Agreement states the "Founder-Employers" and SEIU 775 "are

---

[5] Under principles of federalism, governmental plans are exempt from ERISA. 29 U.S.C. § 1003(b)(1); Navlet, 164 Wn.2d at 828; see also Fromm v. Principal Health Care of Iowa, Inc., 244 F.3d 652, 653 (8th Cir. 2001); Roy v. Teachers Ins. & Annuity Ass'n, 878 F.2d 47, 49 (2d Cir. 1989).

parties to a collective bargaining agreement which provides for the establishment of a jointly administered training fund (hereinafter the "Fund") to provide training benefits to individuals eligible to participate in the Fund."

> WHEREAS, the parties wish to set up the Fund so that it may be a multiemployer employee welfare benefit plan in order to allow for the future participation in the Fund by other employers with collective bargaining agreements with the Union providing for such participation; and

> WHEREAS, the parties further wish to establish and operate the Fund as a tax exempt Voluntary Employee Benefit Association under Section 501(c)(9) of the Internal Revenue Code, or any successor to such legislation; and

> NOW, THEREFORE, in consideration of the foregoing premises and intending to be legally bound, the Union and the Founder-Employers adopt this Agreement and Declaration of Trust.

The Agreement defines "participating employer" as an employer who must make contributions to the training fund.[6] The Agreement states contributions "will be used to develop [training, continuing education, and peer mentorship] products, services, and infrastructure." Contributions made after 2009 "will be used to operationalize [training, continuing education, and peer mentorship] service delivery." "Appendix A" to the Agreement states that training "will be offered beginning January 1, 2010."

The Agreement vested authority in a "Board of Trustees" that "shall consist of six (6) Trustees, half of whom shall be appointed by the Union . . . and half of whom shall be appointed by the Founder-Employers." When there is a vacancy, "Employer Trustees" appoint successor Employer Trustees. In accord with ERISA, the Board of Trustees "shall be fiduciaries with respect to the Trust [Agreement] . . . . The Trustees shall have full, discretionary and exclusive power and authority to administer the Fund."

---

[6] The 2007 Agreement refers to the employer as "Covered Employer." The 2016 "Restated" Agreement refers to the employer as "Participating Employer." For purposes of clarity, we use the term "participating employer."

The initial Employer Trustees were Dr. Martin Levine from Group Health Cooperative,[7] Guiding Lights Network founder Eric Lui, and Chesterfield Healthcare Services owner and president Stella Ogiale. The Trustees hired Charissa Raynor as executive director, Armilito Pangilinan as director of finance and administration, and Christine Jiminez as director of operations of the Training Partnership. Raynor reports directly to the Board of Trustees. Beginning in 2007, seven private employers made contributions to the training and education fund: Chesterfield Health Services, Korean Women's Association, Unique Services, Addus Healthcare, Amicable Healthcare, Catholic Community Services, and ResCare of Washington.

November 2008 Initiative 1029

In November 2008, Washington voters approved Initiative 1029. LAWS OF 2009, ch. 2. Initiative 1029 amended chapter 74.39A RCW. LAWS OF 2009, ch. 2. Because the office of the governor and the exclusive bargaining representative for individual providers did not establish a joint partnership as directed under former RCW 74.39A.009(14) (2007), Initiative 1029 amended the statute to define "training partnership" as "a joint partnership or trust that includes the office of the governor and the exclusive bargaining representative of individual providers." Former RCW 74.39A.009(23) (2009).[8]

2009-2011 CBA between SEIU 775 and the State

In 2009, SEIU 775 and the State negotiated the July 1, 2009 to June 30, 2011 CBA. The State agreed to "become and remain a participating employer" in the Training Partnership and make contributions. The 2009-2011 CBA defines a "training

---

[7] Group Health Cooperative is now Kaiser Permanente.
[8] Emphasis added.

partnership":

> Pursuant to RCW 74.39A.009(23) and [RCW] 74.39A.360, there shall be established a Training Partnership (or "Partnership"). The Training Partnership will possess the capacity to provide training, peer mentoring, workforce development, and other services to individual providers. The Employer shall become and remain a participating employer in such a Partnership during the complete life of this Agreement, and any extension thereof.

The contribution rate the State agreed to pay to the Training Partnership is based on the number of hours worked by in-home individual health care providers. The State made its first contributions to the Training Partnership in 2009.

November 2011 Initiative 1163

In 2011, Washington voters approved Initiative 1163. LAWS OF 2012, ch. 1. Initiative 1163 amended chapter 74.39A RCW to require "all long-term care workers obtain criminal background checks" and ensure "adequate training." LAWS OF 2012, ch. 1. Initiative 1163 increased the training and certification requirements for long-term care workers. In addition to the peer mentoring and annual 12-hour continuing education requirements, the initiative required all long-term home care workers and individual providers to complete 75 hours of "entry-level training." RCW 74.39A.331, .341(1), .074(1)(b). DSHS must approve training requirements and curriculum. RCW 74.39A.074(2).

Harris v. Quinn

In Harris v. Quinn, ___ U.S. ___, 134 S. Ct. 2618, 189 L. Ed. 2d 620 (2014), the United States Supreme Court held that requiring health care providers who are treated as employees solely for the purpose of collective bargaining to pay an involuntary "agency fee" in lieu of union membership dues is a violation of the First Amendment to

the United States Constitution. Harris, 134 S. Ct. at 2639-40 (citing Knox v. Serv. Emps. Int'l Union, Local 1000, 567 U.S. 298, 132 S. Ct. 2277, 183 L. Ed. 2d 281 (2012)).

Public Records Request

On December 9, 2015, Freedom Foundation sent an e-mail to the Training Partnership with a "Request for public records" under the Public Records Act (PRA), chapter 42.56 RCW.

According to the Freedom Foundation labor policy director, the Freedom Foundation is a "nonprofit Washington organization" that "submits public records requests to agencies that work with individual providers ("IPs") and other quasi-public and public employees in order to inform IPs of their constitutional right to support or not support a union." Freedom Foundation asked the Training Partnership to produce copies of the following:

1. The Partnership's Operating Agreement and all resolutions/rules adopted by the Trustees of the Partnership pursuant to the powers delegated, as referenced in Article 15.2 of SEIU 775's collective bargaining agreement with the State of Washington.

2. The total amount of money contributed to the Training Partnership by the State of Washington, as required by Article 15 of SEIU 775's collective bargaining agreement with the State of Washington, in each of the following calendar years: 2012, 2013 and 2014.

3. All emails, documents or records created or received by Training Partnership staff or representatives that contain any of the following terms:
   a. Harris v. Quinn
   b. Freedom Foundation (aka, "FF" and "EFF")
   c. Collective bargaining
   d. Right-to-work (aka, "RTW," "R2W," and "right to work")

4. All Training Partnership staff emails sent to or received from an "@seiu775.org" email domain since January 1, 2014.

5. The total amount of money paid to SEIU 775 by the Training Partnership for rent, office supplies and any other services in each of the following calendar years: 2012, 2013 and 2014.

6. The total number of individual providers, as defined by RCW 74.39A.240, who received training from the Training Partnership in each of the following calendar years: 2012, 2013 and 2014.

7. The total number of individual providers, as defined by RCW 74.39A.240, who successfully completed their training with the Training Partnership in each of the following calendar years: 2012, 2013 and 2014.

The Training Partnership Trustees denied the Freedom Foundation's PRA request on January 25, 2016. The Training Partnership asserted it is "not a public agency . . . subject to the disclosure requirements under Chapter 42.56 RCW."

PRA Lawsuit

On April 18, 2016, Freedom Foundation filed a "Complaint for Declaratory Relief, Writ of Mandamus for Production of Public Records, Fees, and Penalties." The complaint alleged the Training Partnership is the "functional equivalent" of a state agency and subject to the PRA. Freedom Foundation alleged the Training Partnership is created, regulated, and funded by the government and performs a government function.

The Training Partnership filed an answer asserting it is neither a state agency nor the functional equivalent of a state agency subject to the PRA:

[The Training Partnership] is a non-profit I.R.C.[9] § 501(c)(3) organization and an ERISA multi-employer welfare benefit plan. It operates independently from the State of Washington, both according to its Trust Agreement and as required by federal ERISA statutes.

Summary Judgment Dismissal

The Training Partnership filed a motion for summary judgment dismissal of the lawsuit. The Training Partnership argued as a matter of law an "ERISA multi-employer

---

[9] Internal Revenue Code.

welfare benefit plan" is exempt from the PRA. The Training Partnership also argued it is not the functional equivalent of a state agency under Telford v. Thurston County Board of Commissioners, 95 Wn. App. 149, 974 P.2d 886 (1999).

The Freedom Foundation did not address whether as a multi-employer welfare benefit plan under ERISA the Training Partnership is exempt from the PRA as a matter of law. The Freedom Foundation argued the Training Partnership was the functional equivalent of a state agency and there were material issues of fact as to each of the four Telford factors.

The court granted the motion for summary judgment and dismissed the lawsuit. The court issued a 37-page memorandum decision. The court ruled because as a matter of law the Training Partnership "is an ERISA welfare trust, it cannot be an 'agency' under the PRA. . . . There is simply no dispute that the Training Partnership is an ERISA-exempt government plan."[10] The court also ruled the Training Partnership is not the functional equivalent of a state agency under the PRA:

> The Court further concludes that under the Telford factors, the Training Partnership is not the functional equivalent of an "agency" under the PRA. The training it provides to HCAs[11] is not an inherent government function. Although a significant portion of the Training Partnership's budget comes from DSHS, the money it receives are contributions for hours worked by independent HCAs covered by the collective bargaining agreement between SEIU and the state. Although DSHS approves the training curriculum and instructors provided by the Training Partnership, and it works with the Training Partnership to monitor HCAs' compliance with the statutory training requirements, the state has no involvement in the Training Partnership's day-to-day operations.

---

[10] In a footnote in the opening brief, for the first time on appeal, the Freedom Foundation asserts the Training Partnership is a government plan exempt from ERISA. For the first time in the reply brief, Freedom Foundation claims there is a material issue of fact about whether federal law applies because the Training Partnership is not an ERISA plan. We do not consider arguments made for the first time on appeal. RAP 9.12. We also do not address the merits of an issue raised in a footnote. Norcon Builders, LLC v. GMP Homes VG, LLC, 161 Wn. App. 474, 497, 254 P.3d 835 (2011).

[11] Home care attendants.

Finally, despite government statements that this Training Partnership was established or created by statute, the statute did not in fact create this non-profit entity. The legislature authorized the creation of "a" training partnership, but this particular entity was formed by SEIU and three private employers. The state then chose, through the terms of a collective bargaining agreement, to make contributions to this entity. There is nothing in the formation documents that gives the state the authority to run the Training Partnership, to appoint trustees to its board, to dictate policy or to enter into transactions on its behalf.

Summary Judgment Standard of Review

Freedom Foundation contends the court erred in dismissing the lawsuit on summary judgment.[12] We review an order of summary judgment dismissal de novo and engage in the same inquiry as the trial court, viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party. Fortgang v. Woodland Park Zoo, 187 Wn.2d 509, 518, 387 P.3d 690 (2017).

The moving party bears the initial burden of showing the absence of an issue of material fact. Young v. Key Pharmaceuticals, Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989). Once the moving party has met its burden, the burden shifts to the nonmoving party to present admissible evidence demonstrating the existence of a genuine issue of material fact. Pac. Nw. Shooting Park Ass'n v. City of Sequim, 158 Wn.2d 342, 351, 144 P.3d 276 (2006). If the nonmoving party cannot meet its burden then the trial court should grant the motion for summary judgment. Young, 112 Wn.2d at 225.

We consider supporting affidavits and other admissible evidence based on personal knowledge. Int'l Ultimate, Inc. v. St. Paul Fire & Marine Ins. Co., 122 Wn. App. 736, 744, 87 P.3d 774 (2004). Conclusory statements do not create a genuine issue of

_____

[12] The Training Partnership filed a motion to strike "Appendix A, Timeline of Litigation," of Freedom Foundation's opening brief. The Training Partnership asserts the appendix it is not part of the record below and allows Freedom Foundation to file a brief that exceeds the 50-page limit under RAP 10.4(b). Because Freedom Foundation's brief is 50 pages without the appendix, we grant the Training Partnership's motion to strike.

material fact for trial. Int'l Ultimate, 122 Wn. App. at 744. When reasonable minds could reach but one conclusion, summary judgment is appropriate. Owen v. Burlington N. Santa Fe R.R., 153 Wn.2d 780, 788, 108 P.3d 1220 (2005)

The PRA

The PRA is a strongly worded mandate for broad disclosure of public records. Planned Parenthood of the Great Nw. v. Bloedow, 187 Wn. App. 606, 618-19, 350 P.3d 660 (2015). Courts must liberally construe the PRA "to promote this public policy and to assure that the public interest will be fully protected." RCW 42.56.030.

The PRA applies only to the records of an "agency" as defined by the act. RCW 42.56.070, .100, .010(1); Yakima County v. Yakima Herald-Republic, 170 Wn.2d 775, 792, 246 P.3d 768 (2011). The PRA defines "agency" as follows:

> "Agency" includes all state agencies and all local agencies. "State agency" includes every state office, department, division, bureau, board, commission, or other state agency. "Local agency" includes every county, city, town, municipal corporation, quasi-municipal corporation, or special purpose district, or any office, department, division, bureau, board, commission, or agency thereof, or other local public agency.

RCW 42.56.010(1). The PRA requires each agency to "make available for public inspection and copying all public records." RCW 42.56.070(1).

Freedom Foundation concedes the Training Partnership is not a state agency. Freedom Foundation contends genuine issues of material fact as to whether the Training Partnership is the functional equivalent of a state agency preclude summary judgment dismissal of the PRA lawsuit.

A nongovernment entity is subject to the PRA if it is the "functional equivalent" of a public agency. Fortgang, 187 Wn.2d at 512-13. In Fortgang, the Washington Supreme Court adopted the four-factor Telford balancing test to determine whether a

15

nongovernmental entity is the functional equivalent of a public agency subject to the PRA. Fortgang, 187 Wn.2d at 512-13.

The four factors the court considers in deciding whether a private entity is the functional equivalent of an agency subject to the PRA are: (1) Whether the entity performs a government function, (2) the extent to which the government funds the entity's activities, (3) the extent of government involvement in the entity's activities, and (4) whether the entity was created by the government. Clarke v. Tri-Cities Animal Care & Control Shelter, 144 Wn. App. 185, 192, 181 P.3d 881 (2008) (citing Telford, 95 Wn. App. at 162).

Each factor "need not be equally satisfied." Clarke, 144 Wn. App. at 192. In applying the factors, the court considers "whether 'the criteria on balance' " suggests that the entity is the functional equivalent of a state agency. Fortgang, 187 Wn.2d at 518 (quoting Clarke, 144 Wn. App. at 192). Although there may be some entities that "are unambiguously private," the Telford factors are "an appropriate way to decide whether a private entity must comply with PRA disclosure requirements."[13] Fortgang, 187 Wn.2d at 522, 513.

### The First Telford Factor: Governmental Function

In determining "government function," the court determines whether the entity performs " 'core' government functions, or functions that could not be delegated to the private sector." Fortgang, 187 Wn.2d at 524[14] (quoting Clarke, 144 Wn. App. at 194). The court considers "the nature of the disputed entity's activities" and whether the

---

[13] Therefore, even if the Training Partnership is exempt from the PRA as an ERISA plan, we address the Telford factors.

[14] Citation omitted.

16

legislation defines the entity and "actually <u>obligates</u>" the entity to perform an inherently public obligation that cannot be delegated to the private sector. <u>Fortgang</u>, 187 Wn.2d at 525-26.[15]

Freedom Foundation contends federal Medicaid law, state legislation, and the participation of the Training Partnership in statutory work groups create genuine issues of material fact as to whether the Training Partnership performs a core government function.

Freedom Foundation argues the Training Partnership performs a government function because federal Medicaid and state law require the Training Partnership to train individual providers. Interpretation of a statute is a question of law the court reviews de novo. <u>Whatcom County Fire Dist. No. 21 v. Whatcom County</u>, 171 Wn.2d 421, 427, 256 P.3d 295 (2011).

Federal Medicaid law and the implementing regulations do not mandate training in-home health care service providers. 42 U.S.C. § 1396a; 42 C.F.R. §§ 432.1- 433.1. Federal law mandates training only for individuals hired to assist with administrative tasks, not in-home care service providers. 42 U.S.C. § 1396a(4); 42 C.F.R. § 432.30(a).[16]

State law does not require the Training Partnership to perform a government function. Chapter 74.39A RCW does not designate the Training Partnership. The plain and unambiguous language of former RCW 74.39A.360 states "a" training partnership

---

[15] Emphasis in original.

[16] Under 42 U.S.C. § 1396a(a)(4)(B), a state plan must provide for the training of "subprofessional staff" in the "administration of the plan and for the use of nonpaid or partially paid volunteers in a social service volunteer program in providing services to applicants and recipients and in assisting any advisory committees established by the State agency."

shall provide training to individual providers. Former RCW 74.39A.360 states that the "exclusive bargaining representative shall designate the training partnership." SEIU 775 designated the Training Partnership.

Freedom Foundation cites former RCW 74.39A.270(5)(a) (2011) to argue that training individual health care providers is a core government responsibility that DSHS cannot delegate to the Training Partnership. Former RCW 74.39A.270(5)(a) (2011) does not support this argument.

Former RCW 74.39A.270(5)(a) (2011) authorizes DSHS "to establish a plan of care for each consumer" and states the "core responsibility" is "to manage long-term in-home care services under this chapter." The statute requires DSHS to perform background checks for individual providers, approve training curriculum, and set minimum qualifications for training instructors. RCW 74.39A.261, 074, .076; see also WAC 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, -1060. The statutes authorize DSHS to enforce qualification and training requirements, refuse to contract with a health care provider, suspend or revoke a contract, impose additional training requirements for noncompliance, or deny payment to individual providers for noncompliance. RCW 74.39A.080, .086.[17] None of the statutory enforcement responsibilities of DSHS are delegated to the Training Partnership. Clarke, 144 Wn. App. at 194. The undisputed record shows the Training Partnership develops the curriculum, provides training that is approved by DSHS, and

---

[17] Under the Washington State Medicaid plan, the client contracts directly with an in-home care provider. RCW 74.39A.270(4); WAC 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, -106-0010 (defining "individual provider"). The client has the right to select, hire, supervise the work of, and terminate any individual provider. RCW 74.39A.270(4).

tracks training of individual healthcare providers.[18] An entity does not perform a government function "any time it contracts with the government pursuant to enabling legislation." Fortgang, 187 Wn.2d at 525.

Freedom Foundation argues the training for individual providers is a "non-delegable government function" because federal law "specifically requires states to retain ultimate responsibility of homecare aid training funded by Medicaid dollars." Whether federal law imposes a nondelegable duty is a question of law, not a question of fact. Clarke, 144 Wn. App. at 192-94; Telford, 95 Wn. App. at 163-64.

While states can provide training to long-term care workers, there is no federal requirement to do so. Although federal Medicaid law requires states to develop safeguards to ensure the quality of care, the "[s]tates design and administer their Medicaid programs within broad federal guidelines." Caritas Servs., 123 Wn.2d at 396. In accord with federal law, section 4480 of the State Medicaid Manual states:

> E. Providers.—States must develop provider qualifications for providers of personal care services and establish mechanisms for monitoring the quality of service. . . .

---

[18] A 2009 DSHS healthcare services bulletin states the responsibilities of the Training Partnership are limited to the following:

- Deliver the current curricula for Orientation, Safety Training, Revised Fundamentals of Caregiving, Modified Fundamentals of Caregiving, Parent Provider Training through the ARC [for people with intellectual and developmental disabilities], Nurse Delegation for Nursing Assistants core training and Special Focus on Diabetes, and Continuing Education to all IPs.
- Register IPs. IPs will register themselves through the Training Partnership's web portal . . . or by calling the Member Resource Center toll free . . . .
- Track all training required and completed by IPs.
- Remind IPs of training requirements.
- Notify a Reporting Unit of an IP's training progress (completion, in jeopardy, not complete) via email alerts sent to the Reporting Unit Site Coordinator. . . .
- Provide HCS/DDD/AAA [(Home and Community Services Division/Division of Developmental Disabilities/Regional Administrators Area Agency on Aging)] offices with a flyer explaining to the IP how to register for training and who to call with questions about training.
- Provide HCS/DDD/AAA offices with Orientation materials.

States may wish to employ several methods to ensure that recipients are receiving high quality personal care services. . . . States can also establish basic minimal requirements related to age, health status, and/or education and allow the recipient to be the judge of the provider[']s competency through an initial screening. States can provide training to personal care providers. States also may require agency providers to train their employees.[19]

We reject Freedom Foundation's assertion that the CBA obligates the Training Partnership "to exclusively train [individual providers]." Former RCW 74.39A.360 states that the exclusive bargaining representative shall designate "a training partnership."[20]

[F]or individual providers represented by an exclusive bargaining representative under RCW 74.39A.270, all training and peer mentoring required under this chapter shall be provided by a training partnership. . . . The exclusive bargaining representative shall designate the training partnership.

Former RCW 74.39A.360.

Freedom Foundation also asserts the participation of the Training Partnership in the legislative work groups shows the Training Partnership " 'execute[s] the law' " and makes policy. But a private entity does not make policy or legislate by participating in work groups. See Spokane Research & Def. Fund v. W. Cent. Cmty. Dev. Ass'n, 133 Wn. App. 602, 608, 137 P.3d 120 (2006) (the private entity "does not make policy or legislate").

We conclude the first Telford factor does not weigh in favor of finding the Training Partnership is the functional equivalent of a state agency.

---

[19] The State Medicaid Manual, ch. 4, § 4480, at 4-496 (June 28, 2000), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Paper-Based-Manuals-Items/CMS021927.html?DLPage=1&DLEntries=10&DLSort=0&DLSortDir=ascending.

[20] Emphasis added.

The Second Telford Factor:  Government Funding

The focus of the funding factor is "primarily on the percentage of funding attributable to public sources." Fortgang, 187 Wn.2d at 528.[21]  There is no dispute that the majority of funding for the Training Partnership is from monthly contributions from the State or that the contributions are based on the number of hours worked by each individual health care provider.  The record shows that in 2014, the Training Partnership received 75 percent of its funding from the State, or "approximately $16 million out of $21 million in total revenue . . . under the terms of the SEIU collective bargaining agreement."  Nor does the Training Partnership dispute that the rate of contribution from the State increased from $0.30 per hour in 2014 to $0.37 in 2015 or that the rate of contribution increased from $0.37 per hour in 2015 to $0.38 in 2016.  But the State contribution rate in 2013 was also $0.38 per hour.

Freedom Foundation claims there is an issue of material fact as to the nature of the contributions because the contributions from the State are a fixed allocation and not a fee-for-service.  The record does not support Freedom Foundation's argument.  Unlike in Fortgang where the zoo received a fixed annual allocation, here, the State employer contributions to the Training Partnership vary each month depending on the number of hours worked.  Fortgang, 187 Wn.2d at 528-29.  While the request for funding from the legislature under RCW 74.39A.300(1) through (3) is based on an estimate of hours to be worked, the CBA establishes that the monthly State contributions are based on the actual number of hours worked by an individual provider.

Freedom Foundation also asserts that receipt of government grants shows the Training Partnership is the functional equivalent of a state agency.  But "[g]overnmental

---

[21] Emphasis omitted.

grant receipt does not mandate [PRA] application." Spokane Research & Def. Fund, 133 Wn. App. at 609.

While the percentage of funding the Training Partnership receives from the State supports finding it is the functional equivalent of a state agency subject to the PRA, "[t]o the extent courts look beyond percentage and consider the nature of a public funding scheme, they hold . . . that a fee-for-services model weighs against functional equivalency even where an entity receives all or most of its funding from public sources." Fortgang, 187 Wn.2d at 528[22]; see also Spokane Research & Def. Fund, 133 Wn. App. at 609 (funding factor did not weigh in favor of functional equivalence although entity received 75 percent of its funding from the government). However, because case law treats the percentage of funds from public sources as "the foremost consideration when applying the second Telford factor," we conclude the nature of the funding is either inconclusive or weighs in favor of functional equivalency. Fortgang, 187 Wn.2d at 527-29; see also Spokane Research & Def. Fund, 133 Wn. App. at 609.

The Third Telford Factor:  Government Control

The third factor considers whether the government controls day-to-day operations. Fortgang, 187 Wn.2d at 530-31; Spokane Research & Def. Fund, 133 Wn. App. at 609.

Freedom Foundation contends there are material issues of fact concerning the role of the State in day-to-day operations of the Training Partnership.  Freedom Foundation asserts that because DSHS must approve training curriculum, the State has "veto power over [the Training Partnership]'s discretionary acts."

---

[22] Emphasis in original.

The statutory requirement to approve the curriculum used to train long-term care workers does not create a material issue of fact as to whether the State is involved in the day-to-day operations of the Training Partnership.[23] Further, the record shows there are "more than 50" other community instructors who provide training to long-term care workers. DSHS reviews training curriculum and "approve[s] it or . . . [doesn't] approve it."

Freedom Foundation claims daily communications between the Training Partnership and DSHS show DSHS controls the day-to-day operations. Freedom Foundation points to an Internet portal the Training Partnership and DSHS shared at one time to facilitate, track, and report training and a January 2016 e-mail between a DOH employee and a Training Partnership employee related to daily training reports. Neither the Internet portal nor the e-mail creates a material issue of fact as to whether DSHS has authority over the day-to-day operations of the Training Partnership. Under RCW 74.39A.360(1)(c), the Training Partnership must track and report individual provider training progress to DSHS. See also WAC 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(1).

Freedom Foundation contends that contracts between the Training Partnership and public universities and community colleges create an issue of material fact over the State's day-to-day control of the Training Partnership. The Training Partnership contracts with the University of Washington to create training material and with Invista

---

[23] DSHS must approve the curriculum used for minimum training requirements for long-term care workers. RCW 74.39A.074(2); see also RCW 74.39A.341(4) (DSHS must approve curriculum used for continuing education). DSHS may only approve curriculum that (1) has "been developed with input from consumer and worker representatives" and (2) requires "comprehensive instruction by qualified instructors." RCW 74.39A.074(2), .341(4).

Performance Solutions[24] for translation and training services. The record establishes that DSHS is not involved in negotiating the contracts, is not a party to the contracts, and has no authority over the contracts. See Fortgang, 187 Wn.2d at 530.

The unrefuted testimony of Training Partnership executive director Raynor and CR 30(b)(6) DSHS witness director Bea-Alise Rector establishes the State has no day-to-day control over the Training Partnership. Freedom Foundation cites chapter 388-71 WAC, "Home and Community Services and Programs," to argue because "no less than 35" state regulations refer to the Training Partnership, the State exerts day-to-day control over the Training Partnership. Chapter 388-71 WAC contains hundreds of regulations. The regulations under chapter 388-71 WAC do not create a material issue of fact as to whether the Training Partnership is the functional equivalent of a government agency. Fortgang, 187 Wn.2d at 530 ("mere regulation . . . does not weigh in favor of PRA accountability").

The record also does not support the Freedom Foundation's argument that three governor-nominated members on the Board of Trustees shows the State controls the day-to-day operations of the Training Partnership. Freedom Foundation relies on a 2009 letter from then-governor Christine Gregoire nominating four people to serve as Employer Trustees on the board of the Training Partnership. The Training Partnership Agreement does not vest any authority in the State to appoint Trustees. The Board of Trustees decided to appoint three of the four nominees in 2009.[25] And as previously noted, under federal ERISA law, the Trustees must "insulate the trust from the

---

[24] Invista Performance Solutions is a consortium of county community and technical colleges that provide training and education to community organizations.

[25] The Restated 2009 Agreement and trust declaration increased the number of Trustees to seven Union Trustees and seven Employer Trustees.

employer's interest" and act on behalf of participants and beneficiaries. <u>Amax</u>, 453 U.S. at 333 ("[T]he fiduciary requirements of ERISA specifically insulate the trust from the employer's interest.").

The third <u>Telford</u> factor weighs against finding the Training Partnership is the functional equivalent of a state agency.

### The Fourth Telford Factor:  Origin of the Training Partnership

The fourth <u>Telford</u> factor is the "creation" of the entity. <u>Fortgang</u>, 187 Wn.2d at 531. The court considers whether "special legislation" created the entity. <u>Fortgang</u>, 187 Wn.2d at 531-32. Where, as here, the entity is incorporated solely by private individuals, "we cannot attribute its 'origin' to special legislation or other government action." <u>Fortgang</u>, 187 Wn.2d at 532; <u>Spokane Research & Def. Fund</u>, 133 Wn. App. at 609-10 (entity not created by government where there was clear intent to operate the community center independently from the city despite city involvement in the development of the community center).

Freedom Foundation contends the language used in former RCW 74.39A.009(14) (2007) defining "training partnership," the language used in the CBAs, a 2009 DSHS memorandum, testimony, and a 2008 Public Employment Relationship Commission (PERC) decision, <u>SEIU Healthcare 775NW v. Washington State - Individual Providers</u>, Decision No. 10193 Case No. 21917-U-08-5583 (PECB 2008), create material issues of fact as to whether the government created the Training Partnership.[26]

---

[26] Although the 2008 PERC decision states that "[i]n 2007, the Legislature established a training partnership," the legislative history does not support that finding. <u>SEIU Healthcare 775NW</u>, Decision No. 10193 Case No. 21917-U-08-5583, at 6.

The undisputed record establishes three private employers and SEIU 775 created the Training Partnership as a multi-employer welfare benefit plan to train in-home health care providers under ERISA. The record also establishes the State was not a party to the original Agreement or trust declaration. The State did not become a participating employer or make any contributions to the Training Partnership until after entering into the 2009-2011 CBA.

The fourth Telford factor weighs against finding the Training Partnership is the functional equivalent of a state agency.

In sum, we conclude Freedom Foundation did not meets its burden on summary judgment to show genuine issues of material fact. Because on balance the Telford factors weigh against finding the Training Partnership is the functional equivalent of a state agency, we conclude the Training Partnership is not subject to the PRA and the trial court did not err in granting summary judgment dismissal.

Protective Order

Freedom Foundation contends the court erred by granting the Training Partnership's motion for a protective order. On July 29, 2016, the trial court entered an order granting in part and denying in part the motion of the Training Partnership for a protective order.

Freedom Foundation argues the protective order prevented review of "highly relevant information pertaining to [the Training Partnership]'s government involvement and funding." The record does not support this argument.

Under CR 26(c), the court has "broad discretion to tailor relief regarding the scope of discovery." Dalsing v. Pierce County, 190 Wn. App. 251, 262, 357 P.3d 80

26

(2015). The trial court may order " 'that the discovery not be had' at all, or it may place conditions or limitations on the requested discovery." T.S. v. Boy Scouts of Am., 157 Wn.2d 416, 424, 138 P.3d 1053 (2006) (quoting CR 26(c)(1)). The Training Partnership argued that discovery should be limited to "only evidence that may raise a 'genuine issue of material fact.' " The Training Partnership asked the court to limit discovery to the Telford factors. Freedom Foundation argued it was entitled to "broad discovery" because Telford is a "fact-intensive inquir[y]."[27]

The court granted the motion for a protective order in part. The court ruled that "discovery shall be limited to evidence that is likely to establish a genuine issue of material fact in the pending Motion for Summary Judgment." The court considered and ruled on each of the objections to interrogatories and requests for production propounded by Freedom Foundation and limited discovery to communications, contracts, and finances involving the State or any state agency. The court did not abuse its discretion by granting the motion for a protective order in part by limiting discovery to information related to the Telford factors.

Order To Seal/Redact Discovery Documents

Freedom Foundation contends the court erred by granting the motion to seal documents produced for in camera review. Freedom Foundation argues the court did not state a reason for sealing and redacting the documents. The record does not support Freedom Foundation's argument.

We review the decision to seal records for abuse of discretion. Bennet v. Smith Bundy Berman Britton, PS, 176 Wn.2d 303, 307, 291 P.3d 886 (2013). Under CR

---

[27] Emphasis in original.

26(c), the court may seal discovery material "for good cause shown." Bennet, 176 Wn.2d at 308.

On August 12, 2016, the court held a discovery conference. The Training Partnership objected to requests for production of documents and information related to the competitive bid process.[28] The Training Partnership argued the financial data "is extremely sensitive" and "there have been attempts by competitors to get this data." The Training Partnership agreed to provide "the total amount" of the contracts but argued the individual service contracts were not relevant.

The court ruled it would conduct an in camera review to determine whether the information "could in fact help [Freedom Foundation] establish the quantity of involvement of the governmental agencies." The court instructed the Training Partnership to file the unredacted documents with a motion to seal.

The Training Partnership filed a "Motion to Seal/Redact Documents" and filed "Appendix A" under seal for in camera review. The Training Partnership asserted there was good cause under CR 26(c) to "allow the very limited redaction of the documents." The Training Partnership argued the information was "proprietary and irrelevant to any issue before the Court in this litigation."

Following the in camera review, the court found there was good cause to seal and redact the documents submitted for in camera review. The court concluded the Training Partnership established good cause to redact individual rate and cost data.

---

[28] Request for production 16 asks for "[a]ll documents . . . pertaining [to] the '[request for proposal] competitive bid process' relating to the [Training] Partnership's selection of training instructors and training networks." Request for production 24 asks for "[a]ll documents . . . pertaining to requests for proposals for curriculum creation and the creation of products and services related to the training curriculum."

The court did not abuse its discretion by granting the motion to seal and redact documents produced for an in camera review.

CR 56(f) Motion to Continue

Freedom Foundation contends the trial court erred in denying a CR 56(f) motion to continue.

We review the ruling on a CR 56(f) motion for abuse of discretion. Bavand v. OneWest Bank, FSB, 196 Wn. App. 813, 822, 385 P.3d 233 (2016). CR 56(f) states that if the party opposing a summary judgment motion shows it "cannot present by affidavit facts essential to justify the party's opposition," the court may order a continuance to "permit affidavits to be obtained or depositions to be taken or discovery to be had."

The trial court may deny a motion to continue when (1) the requesting party does not have a good reason for the delay in obtaining evidence, (2) the requesting party does not indicate what evidence would be established by further discovery, or (3) the new evidence would not raise a genuine issue of fact. Perez-Crisantos v. State Farm Fire & Cas. Co., 187 Wn.2d 669, 686, 389 P.3d 476 (2017). The court may consider the necessity of a reasonably prompt disposition of the case and prior continuances. Trummel v. Mitchell, 156 Wn.2d 653, 670, 131 P.3d 305 (2006).

Freedom Foundation filed the lawsuit on April 18, 2016. The court scheduled a discovery deadline for February 27, 2017. On June 8, 2016, the Training Partnership filed the motion for summary judgment dismissal and noted the hearing for August 19.

On July 14, 2016, Freedom Foundation filed a CR 56(f) motion to continue. Freedom Foundation stated that "two months after filing the case," it sent the Training

Partnership requests for discovery, and "discovery is ongoing." The court granted the motion and rescheduled the hearing for October 14.

On August 12, Freedom Foundation requested a two-week continuance of the October 14 summary judgment hearing. The court rescheduled the hearing to October 28.

On October 7, 2016, Freedom Foundation filed another CR 56(f) motion to continue summary judgment for "two months after discovery is complete." Freedom Foundation argued that it needed additional discovery and depositions and additional time to review approximately 9,000 documents that the Training Partnership produced. Freedom Foundation did not identify what evidence further discovery would establish. Freedom Foundation argued the evidence sought "will raise genuine issues of fact" but could not cite "specific evidence" because the Training Partnership had asserted a number of documents were "confidential."

In response, the Training Partnership asserted that it complied with all discovery requests, DSHS produced over 7,000 pages of documents, Freedom Foundation deposed the CR 30(b)(6) DSHS witness, and Freedom Foundation cancelled the deposition of another Training Partnership witness and did not reschedule.

We conclude the court did not abuse its discretion in denying the CR 56(f) motion to continue the hearing.

Cross Appeal

The Training Partnership challenges denial of the request for attorney fees under

CR 11 and RCW 4.84.185.[29] We review the trial court's decision to deny attorney fees under CR 11 and RCW 4.84.185 for an abuse of discretion. In re Recall of Piper, 184 Wn.2d 780, 786, 364 P.3d 113 (2015).

To impose sanctions under CR 11, the trial court must find that the claim is not well grounded in fact or warranted by law or that the pleading was filed for an improper purpose. Biggs v. Vail, 124 Wn.2d 193, 201, 876 P.2d 448 (1994). The purpose behind the rule is to deter baseless filings, not filings that have merit. Bryant v. Joseph Tree, Inc., 119 Wn.2d 210, 219, 829 P.2d 1099 (1992).

A court may award attorney fees under RCW 4.84.185 if the action was "frivolous and advanced without reasonable cause." Piper, 184 Wn.2d at 786-87. An action is frivolous if, considering the action in its entirety, it cannot be supported by any rational argument based in fact or law. Biggs v. Vail, 119 Wn.2d 129, 136, 830 P.2d 350 (1992).

The Training Partnership contends the court abused its discretion by denying its motion for sanctions and fees because it is an ERISA plan that is not subject to the PRA. Freedom Foundation argues that it "advanced well-grounded arguments applying the Telford test to [the Training Partnership]."

Because a court cannot determine whether a private entity is "unambiguously private" and not subject to the PRA without applying the Telford factors, the trial court did not abuse its discretion by denying attorney fees and sanctions under CR 11 and RCW 4.84.185. See Fortgang, 187 Wn.2d at 522.

---

[29] Freedom Foundation requests the court strike the "irrelevant discussion of unrelated cases" in the cross appeal. Because Freedom Foundation had the opportunity to include argument in its reply brief and point out allegedly extraneous materials, we deny the motion to strike. Engstrom v. Goodman, 166 Wn. App. 905, 909 n.2, 271 P.3d 959 (2012).

Fees on Appeal

The Training Partnership requests attorney fees and costs on appeal under RAP 18.9(a) and RAP 14.2.

An appellate court may award attorney fees as a sanction when the opposing party files a "frivolous" appellate action. Because Freedom Foundation's arguments are not "so totally devoid of merit as to be frivolous," we deny the request for fees on appeal under RAP 18.9(a). Advocates for Responsible Dev. v. W. Wash. Growth Mgmt. Hr'gs Bd., 170 Wn.2d 577, 580, 245 P.3d 764 (2010). However, subject to compliance with RAP 18.1, we award costs and statutory fees to the Training Partnership as the substantially prevailing party under RAP 14.2.

We affirm.

WE CONCUR:

_____ Schindler, J.

_____ Mann, A.C.J.

_____ Leach, J.